[No. 23362. Department Two. December 11, 1931.]

RALPH HANSON, *as Guardian ad litem of Ralph Hanson, Jr., a Minor, Appellant*, v. THE WASHINGTON WATER POWER COMPANY, *Respondent*.[1]

*W. C. Losey,* for appellant.
*Post, Russell, Davis & Paine,* for respondent.

MILLARD, J.—The trial of this action, which was brought by a guardian ad litem to recover for personal injuries sustained by his ward at an electric transformer station of the defendant, resulted in a verdict in favor of the plaintiff. The appeal is from the judgment entered for the defendant notwithstanding the verdict.

The respondent is engaged in the business of supplying electric light and power to the city of Spokane

[1]Reported in 5 P. (2d) 1025.

and other communities in eastern Washington. To safely distribute electricity to the individual homes, it is necessary to reduce to a lower voltage the electricity as it comes over the high power lines. This is accomplished through transformer stations, one of which is located on respondent's lot at Twenty-sixth avenue and Arthur street, in the city of Spokane.

On the south or rear end of that lot, which is one hundred and thirty feet long by fifty feet in width, is a one-story, flat roof building of stucco cement construction. A plot fifty feet by one hundred feet in front or north of the building is landscaped with shrubs and flowers, and a lawn is there maintained.

A tract forty-four feet by twenty-one and one-half feet to the rear of the building is completely enclosed by a heavy woven wire fence. The mesh in this wire is diamond-shaped, the distance from point to point horizontally and from point to point vertically of the mesh being two and one-half to two and three-fourths inches. The lower wire of the mesh turns slightly outward. The wire is attached to iron pipes six feet high, embedded at intervals of six feet in a concrete base which extends around the tract along the fence line. The wire at the bottom is clamped to the cement base.

Along the top of the fence, three strands of smooth wire spaced six inches apart are strung on arms inclined inward at an angle of about forty-five degrees. The mesh wire fence is six feet high, and the additional three wires make the height of the fence seven and one-half feet. On the east and north sides of the enclosure are gates which are securely padlocked. On those gates is woven wire like that, and of the same height, as the wire of the fence. Above the woven wire on the gates are arms leaning inward, with three smooth wires thereon the same as on the fence.

Within the enclosure, the ground of which is covered with heavy gravel and stones, are located the transformers and the structure which carries switches and high voltage wires. The electric transformers are placed on concrete bases and are harmless; that is, no injury would result from merely touching them. On a concrete base within the enclosure is a tower made of iron piping about two inches in diameter and twenty-eight feet high. The iron pipes of this structure are in the form of a square nine feet on each side. On each side of the square the pipe uprights are supported by an iron brace in the form of an "X", and about half way up are cross-beams. The high voltage wires are brought from a pole across the street to the top of the tower, and from that point led down into the building. It would be impossible for anyone to come in contact with those wires or be injured by electricity, even if the person were within the enclosure, provided such person stayed on the ground; that is, to come in contact with the wires and sustain injury from the electricity carried over the wires, it would be necessary to climb the iron tower.

On the high wire fence were attached signs in bright red letters on a white background reading as follows: "DANGER—HIGH VOLTAGE—KEEP OUT." The signs are twelve inches by eighteen inches, and the letters thereon are three and three-fourths inches high.

West and south of the station are residences. North and east of the station the land is in its natural wooded state. About five hundred feet southwest of the station is the Hutton school. The school children are not permitted by their teachers to play on or near the station during school hours. There is evidence that, when an employee of the respondent was not present, small boys played games on the lawn described above. Many children play in the woods near the station.

On Saturday afternoon, November 8, 1930, Ralph Hanson, Junior, (then ten years, ten months and seventeen days old) with three other boys aged, respectively, thirteen, twelve and eleven years, were playing on the lawn in front of the station. This group became engaged in mimic warfare with another group of boys who had a house in a tree about one-half block from the station. For the purpose of utilizing the roof of the transformer station building as a fort, Ralph (who was wearing tennis shoes) and his friends climbed the fence by getting a toe-hold in the wire meshes and by placing their hands in the meshes and pulling themselves up the side of the fence with their arms.

When they entered the enclosure, three of the boys (of whom Ralph was one) climbed the framework of the tower supporting the switches until they got on top of the building. The three boys "shinned" up the two-inch iron pipes until they reached the cross-bars, then swung themselves up as on a trapeze. Ralph came down from the building, filled a sweater with stones from the ground inside the enclosure, took them to the top of the building, and started down for a second load of stone ammunition. On the way down his head in some manner came in contact with an electric switch, which is sixteen feet above the ground of the enclosure, and he was severely burned and hurled to the ground.

Ralph returned to school February 1, 1931, and passed into the next grade, 6-A. He was in grade 6-B at the time of the injury; that is, he was and still is a half grade in school ahead of other boys of his age. Ralph's precocity, it was testified, was due to kindergarten training for some months prior to the date he would arrive at the eligible age (six years) to enter public school. All of the boys testified that they knew what the danger signs attached to the fence meant;

that they did not play around the station grounds when any employee of respondent was present; that they knew, when they were on the roof of the building, they should not be there.

Counsel for appellant contends that, in entering judgment for the respondent notwithstanding the verdict in favor of the appellant, the trial court invaded the province of the jury, as "twelve reasonable minds" (the members of the jury) found there was negligence; that the trial court

". . . by granting judgment *non obstante* has assumed the prerogative of saying that the facts were such that reasonable minds could not differ with the construction placed by him upon the facts."

■■ True, the functions of the jury are not the same as the functions of the court. The jury is a fact-finding body. It must not be forgotten, however, that the court is vested with the authority, and upon it is imposed the duty, of granting a motion for a directed verdict or a motion for judgment n. o. v. when the evidence and all the inferences which the jury could justifiably glean therefrom would be insufficient to support a different finding.

"The credibility of witnesses, the weight and probative value of evidence are to be determined by the jury and not by the judge. However, many decisions of this court established that, in every case, it is the duty of the judge to direct a verdict in favor of one of the parties when the testimony and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding." *Baltimore & Ohio R. Co. v. Groeger,* 266 U. S. 521.

There was no evidence to go to the jury showing that the respondent was guilty of any negligent act. The respondent was free from negligence as a matter of law in erecting and maintaining its transformer sta-

tion. The proximate cause of the injuries of Ralph Hanson, Junior, a mentally alert boy of eleven years, was that boy's own negligence. That negligence was of such a character as to show a want of ordinary or reasonable care for his own safety—that degree of care and caution which an ordinarily prudent person, of that boy's age and understanding, would exercise under like or similar circumstances. Ralph was physically and mentally superior to the average child of his age. He could read and understand danger signs. With knowledge that it was wrong to trespass upon respondent's property, and fully aware that he was subjecting himself to peril, he, with great difficulty, scaled the high wire fence. Having entered the enclosure, Ralph surmounted another obstacle—climbed the tower—to place himself within the danger zone of heavily charged electric lines, where he was injured.

The question of the liability of a defendant for maintaining an attractive nuisance is not before us. Respondent's demurrer to the complaint first raised that question. The question of attractive nuisance was not submitted to the jury. Appellant did not request that the jury be instructed on that theory, nor has the appellant in this court complained of the failure of the trial court to charge the jury on that theory.

Respondent was required to provide only such a protection as would safely guard against any contingency reasonably to be anticipated. To hold otherwise would make the liability of the respondent that of an insurer; and that the law does not demand.

In *Harris v. Cowles*, 38 Wash. 331, 80 Pac. 537, 107 Am. St. 847, an action to recover for personal injuries sustained by a child in a revolving door, the defendant's demurrer to the complaint was sustained. We said:

"We therefore think it has already been made clear by former decisions that this court will not extend the application of the turntable cases beyond a turntable itself. Whatever may be said of the wisdom of that rule, as applied to the one condition, established as it was by judicial decisions, but severely criticized by others refusing to follow it, still, when we contemplate its extension to manifold other relations and conditions which arise in the affairs of life, we must see that it would be productive of litigation to such an extent as would greatly endanger the security of property interests. It is aptly suggested by respondent, in his brief, that swings, teeter boards, lumber piles, fences, gates, walls, buildings, trees, hanging on vehicles, and numerous other things are attractive to children. It will, therefore, be seen that, if this doctrine should be made one of general application for the protection of children against anything that may be especially attractive to them, it would result in requiring all property holders to assume toward children who may be attracted to their premises a degree of duty and care which properly belongs to parents or guardians."

The respondent was not required to maintain a constant guard about the fence because some groups of bright boys could find a ladder or climb on each other's shoulders, and thus get over the protecting fence into the enclosure, and then be able to overcome another handicap (the tower) and climb to a place of danger.

*Graves v. Washington Water Power Company*, 44 Wash. 675, 87 Pac. 956, 11 L. R. A. (N. S.) 452, was an action to recover for injuries sustained by a boy fifteen years old. A power plant of the defendant was maintained on the Spokane River near the Monroe bridge. The electric wires from that plant passed within eighteen to thirty inches from the piers of the bridge, and about thirty feet from the ground. The piers, which were of steel construction, had cross-plates thereon, making in effect a ladder-like structure of the

piers. The plaintiff, attracted by nests of pigeons, climbed one of the piers and came in contact with one of the electric wires of the defendant, and was severely burned thereby. We reversed the judgment entered on the verdict in favor of the plaintiff, and in announcing the rule which is applicable to the facts in the case at bar, we said:

"Ordinarily a person whose duty it is to furnish protection to others against a dangerous agency fully complies with the law when he provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. He is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated as likely to occur. *Decker v. Stimson Mill Co.*, 31 Wash. 522, 72 Pac. 98; *Johnston v. Northern Lum. Co.*, 42 Wash. 230, 84 Pac. 627; *Daffron v. Majestic Laundry*, 41 Wash. 65, 82 Pac. 1089.

"If the appellant had constructive notice that boys were playing about, and sometimes climbing upon, the bridge, the fact of the city's officers being there to chase them away would likewise be known. The carrying of dangerous electric wires upon high poles, or the burying of them in trenches, readily occurs to one as an appropriate requisite for the safety of people who may have occasion to come into the vicinity of said wires. But if a boy, through curiosity, should dig up a wire buried in the ground, or should climb to the top of a high pole, and, in either case, take hold of a 'live' wire and be injured, would it be seriously contended that this was a circumstance which the owner of the wire should be held to have anticipated and guarded against? To be sure, it would be a possible contingency; but would it be so probable that any reasonably prudent person would feel it necessary to be guarded against?

"The respondent invokes the rule that one must so use his own as not to injure another. This is a wholesome and salutary principle of law; but it must have some limitations. It does not mean that a man must operate his machinery, appliances, or other agencies

in such a manner as to absolutely insure and guarantee the safety of every other person. Such owner, in the operation of such agencies, is held to use that degree of ordinary care, foresight, and discretion which a person of ordinary care and prudence would use under the same circumstances. As a matter of law, it may be said that a person of ordinary care and prudence, in the operation of an agency so dangerous as electricity, would and should be exceedingly careful, and so arrange the means of handling and transmitting this powerful and mysterious element as to protect from harm any person or persons whom he might reasonably expect to be in a position to receive harm therefrom. But to say that the owner or operator of an electric plant should foresee and anticipate the presence of children or others in places where the ordinarily prudent, careful and foreseeing person would not expect, or deem it likely for them to be, would impose a burden and responsibility for which there is no justification in law.''

In *Clark v. Longview Public Service Co.*, 143 Wash. 319, 255 Pac. 380, we said:

''The duty which the owner of high-voltage electricity owes to all persons—whether invitees, licensees or trespassers—who it may have reason to believe may come into its proximity, is to guard them from injury resulting from the dangerous appliances; and it can not relieve itself from liability, even as against a trespasser, by showing that it merely refrained from inflicting wanton and wilful injury. Those handling these deadly instrumentalities are responsible for injuries due to their negligence, if they could have reasonably anticipated that someone might be injured by contact with them, and if they should have so anticipated, then they must have guarded them, and this is independent of the question of attractive nuisance as applied to juveniles.''

The rule is not, as counsel for appellant contends, that an electric power company is required to so construct and maintain its transformer stations as to

render it impossible for a boy to "climb into them." To so hold would be to require as we said in *Heva v. School District No. 1,* 110 Wash. 668, 188 Pac. 776, 9 L. R. A. 267, "every property owner having a fence or tree accessible to children at play to maintain a constant guard about them."

The rule that,

"Ordinarily a person whose duty it is to furnish protection to others against a dangerous agency fully complies with the law when he provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. He is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated as likely to occur." *Graves v. Washington Water Power Co.,* 44 Wash. 675, 87 Pac. 956, 11 L. R. A. (N. S.) 452.

we have consistently followed. *Mayhem v. Yakima Power Co.,* 72 Wash. 431, 130 Pac. 485; *Kempf v. Spokane & Inland Empire R. Co.,* 82 Wash. 263, 144 Pac. 77, L. R. A. 1915C 405. That is the rule applicable to the facts in the case at bar, and with that rule the respondent has fully complied.

*Talkington v. Washington Water Power Co.,* 96 Wash. 386, 165 Pac. 87, cited by appellant, is not in point. It does not appear in that case that any warning signs were posted, or that there was any attempt to insulate the wires or in any manner protect against injury from the electric wires. *Clark v. Longview Public Service Co.,* 143 Wash. 319, 255 Pac. 380, is also distinguishable on the facts. While the transformer station in that case was enclosed with a wire fence, yet on two sides there was an opening under the fence two and one-half to four feet in depth which permitted one without difficulty to enter the purported enclosure. There were not any warning signs on the fence. High tension wires, which caused the injuries to the plain-

tiff, were near the ground level. The defendants were patently negligent.

Clearly, a reasonably prudent boy of the age and mentality of Ralph, who knew what the danger signs meant, and who also knew that he was wrongfully within the enclosure, would not have scaled the fence and climbed the tower to come in contact with the electricity. That he was playing at the game of war, does not excuse his negligence any more than would haste or excitement absolve an adult from the consequences of his negligence. Ralph's negligence was the proximate cause of his injuries, and is of itself sufficient, as a matter of law, to bar recovery.

In passing on the contributory negligence of an eleven-year-old boy who was injured under circumstances similar to those in the case at bar, the court said in *Bonniwell v. Milwaukee Light, Heat & Traction Co.*, 174 Wis. 1, 182 N. W. 468:

"Was there such contributory negligence as should prevent a recovery? Clarence was a boy over eleven years old, of average intelligence. He must have known that the circling of the tower alone was attended with some danger. The statement of facts shows that he knew the dangerous character of electric wires. He had been warned by the danger sign plainly visible on the tower, by his father, and soon before the accident was warned by his companion. Nevertheless he grasped the wire relying on the fact that it was 'padded' and assumed that it was not dangerous. Although we give due consideration to the fact that the rules as to negligence applying to children and adults are quite different, we are forced to the conclusion that on the plaintiff's own showing on the uncontradicted evidence, and as a matter of law, contributory negligence was the direct cause of the death."

We have considered all of the authorities cited, but do not find aught therein to convince us that we should

508

depart from the rule enunciated in *Graves v. Washington Water Power Co.*, 44 Wash. 675, 87 Pac. 956.

The judgment is affirmed.

TOLMAN, C. J., MAIN, HOLCOMB, and BEALS, JJ., concur.